[No. D014924. Fourth Dist., Div. One. Sept. 17, 1992.]

WILLIAM F. DEWALT, Plaintiff and Appellant, v.
BERKELEY FORGE & TOOL, INC., et al., Defendants and Respondents.

## Counsel

Harrigan, Ruff, Ryder & Sbardellati, Joseph W. Ruff and Eleanor L. Blais for Plaintiff and Appellant.

Haasis, Pope & Correll, Susan J. Gill and Harvey C. Berger for Defendants and Respondents.

## Opinion

**WIENER, Acting P. J**—Insurance Code section 11583[1] provides in part that "[n]o advance payment or partial payment of damages made by any person, or made by his insurer under liability insurance . . . shall be construed as an admission of liability by the person claimed against . . . . *Any such payments shall, however, constitute a credit and be deductible from any final settlement made* or judgment rendered with respect to such injured or deceased person *which does not expressly take into account such advance payments.*" (Italics added.) According to defendants Berkeley Forge & Tool, Inc., and The Chubb Group of Insurance Companies, section 11583 requires that a written settlement agreement specifically refer to the advance where the parties intend to exclude it from the total settlement. Defendants argue that section 11583 is both (1) a substantive rule prescribing the content of the document embodying the terms of the settlement, and (2) an evidentiary rule precluding the use of oral evidence to explain the circumstances surrounding the settlement or the meaning of extrinsically ambiguous words in the written agreement.

As we shall explain, we reject this expansive interpretation of section 11583. We conclude the Legislature only intended this provision to be a simple rule of accounting to make clear that where the parties fail to consider the advance in negotiating their settlement, it is the insurer and not the claimant who benefits by the parties' oversight.[2] The statute was neither intended to prescribe the contents of the written settlement agreement nor modify the law authorizing the use of oral evidence to explain the intent of the parties and the circumstances surrounding their agreement. We therefore reverse the judgment of dismissal entered after defendants' demurrer to plaintiff William F. Dewalt's second amended complaint was sustained without leave to amend.

---

[1]All statutory references are to the Insurance Code unless otherwise specified.

[2]For example, where the jury is not told about the insurer's advance on behalf of a party found liable, the court must reduce the jury's award of damages by the amount advanced before it enters judgment on the verdict.

## Scope of Review

■ In reviewing an appeal from a judgment of dismissal after a demurrer has been sustained without leave to amend, we must assume the truth of all facts properly pled. (*Blank* v. *Kirwan* (1985) 39 Cal.3d 311, 318 [703 P.2d 58].) Frequently this principle leaves us in the awkward position of treating carefully crafted pleadings as "facts deemed to be true" even when we recognize the plaintiff may have considerable difficulty establishing the truth of such facts at trial. There are other times, however, when our view is not quite as limited. For instance here, where we take judicial notice of additional documents including, but not limited to documents in the same action (*Perdue* v. *Crocker National Bank* (1985) 38 Cal.3d 913, 923, fn. 5 [216 Cal.Rptr. 345, 702 P.2d 503]), we get additional insight into the events underlying the litigation.

The trial court was asked by defendants to take judicial notice of a number of documents which were presented to the Alameda County Superior Court and later to Division One of the First Appellate District in Dewalt's aborted effort to obtain judgment on his settlement with these defendants. Defendants have also asked that we consider Dewalt's initial complaint in this case. Because these documents are properly before us, we include this information in the factual summary which follows. In doing so we wish to emphasize that the "facts" drawn from these documents and the pleadings merely form the basis for our analysis of the trial court's decision to sustain the demurrer. They may still be disputed in later proceedings. Our function now is only to determine whether the allegations of Dewalt's second amended complaint liberally construed state a cause of action.

## Factual and Procedural Background

In June 1985, Dewalt sued Berkeley seeking damages for injuries allegedly suffered when a heavy metal door fell on him while he was at Berkeley's place of business. The parties commenced serious settlement negotiations in June 1988 following an unsuccessful judicial settlement conference which had resulted in the case being continued for trial until September 16, 1988.

On June 23, 1988, Joseph W. Ruff, Dewalt's lawyer, wrote to Berkeley and Chubb rejecting their settlement offer which he described as "part cash, part structured" having a "value of $750,000 less $54,200 for medical bills already paid." He made the following counter offer: "$450,000 cash, $2,200 per month for his life, 30 years guaranteed, with a 3% annual increase on the monthly payments, and with the same lump sum payments in your previous

offer which are $25,000 at five years, $35,000 at ten years, $50,000 at fifteen years, and $112,000 at twenty years." The balance of Ruff's letter explained why he thought the settlement offer was reasonable, touching on various items of damages and the range of possible jury verdicts as to each.

Defendants rejected Ruff's settlement demand but made an oral counter-offer giving Dewalt the choice of selecting one of two plans. Ruff responded in writing to this counteroffer on July 20, 1988. The first two paragraphs of his letter to opposing counsel state:

"On July 19, 1988 you made an oral counter-offer consisting of a choice of one of two plans to settle Mr. Dewalt's case. Plan #1 was $400,000 cash, $1,845 per month for life, 30 years guaranteed, with a 3% annual increase and lump sum payouts of $25,000 at five years, $50,000 at ten years, $75,000 at fifteen years and $150,000 at twenty years. Plan #2 involved the same cash and lump sum payouts, but a monthly sum of $2,615 per month per life, thirty years guaranteed, with no increases.

"I discussed this with my economist and Mr. Dewalt. We feel the offer is in the ball park and would be acceptable to Mr. Dewalt with an adjustment on the Plan #1 monthly payment. If the monthly payment in Plan #1 is increased to $2,150.00 per month then Mr. Dewalt will accept. Please communicate this to your principal and get back to me at your early convenience."

Following Ruff's letter, the parties agreed on a settlement confirmed in an August 10, 1988, letter to Ruff from Chubb's agent:

"This letter will confirm that an annuity for the plaintiff referenced above [Dewalt] will be purchased by Chubb Insurance Company and Central Mutual Insurance Company . . . as follows:

"1.   Cash Up Front: $400,000

"2.   $1,845 per month for life, guaranteed for 30 years, compounding annually at 3%, first payment October 4, 1988 (Age 31).

"3.   Guaranteed Lump Sum Payments

| Amount | Payment Date | Age |
|--------|--------------|-----|
| $ 25,000 | October 4, 1993 | 36 |
| $ 50,000 | October 4, 1998 | 41 |
| $ 75,000 | October 4, 2003 | 46 |
| $150,000 | October 4, 2008 | 51" |

This letter was followed by a letter signed by a paralegal in the law office of Thomas C. Glaspy, counsel for Berkeley, enclosing a "Release and Request for Dismissal." The letter stated, "We have ordered the $400,000 draft, and will forward the same to you upon receipt of the executed closing papers." Ruff acknowledged receipt of the letter and returned the signed release and the request for Dismissal. Ruff conditioned the delivery of these documents by explaining, "I have executed the Request for Dismissal and you are authorized to file it with the Court only when you have caused the $400,000 draft to be delivered to me for Mr. Dewalt."

The "RELEASE OF CLAIMS" provided in part that the parties agreed upon a structured settlement including a $400,000 "Cash payment upon execution of this Release of Claims and Request for Dismissal."

In September 1988, Ruff received checks from Central Mutual and Chubb in the amounts of $323,272 and $22,528 respectively. The total of $345,800 represented the insurers' view that the $400,000 initial cash payment provided by the settlement was properly reduced by the $54,200 which Chubb had previously advanced. Ruff's demand for this additional sum, reflecting his contrary view, was rebuffed by Chubb and his motion for judgment after settlement pursuant to Code of Civil Procedure section 664.6 was denied. His appeal of the order denying his motion to the First Appellate District was dismissed on the ground the order was not appealable.

Dewalt then sued defendants in this action alleging breach of contract and seeking the $54,200 he alleged had been improperly withheld. After two unsuccessful pleading efforts, Dewalt filed a second amended complaint claiming the release of claims was ambiguous and the "true and express" meaning of the settlement was that he was to receive $400,000 cash without any offset for the $54,200 previously advanced. He did not attach the written release to this complaint as he had to his original complaint. Based upon section 11583 and its judicial notice of the documents in the Alameda Superior Court and First Appellate District files as well as the previously attached Release, the court sustained the defendants' demurrer without leave to amend. This appeal ensued.

## DISCUSSION

The decision in this case turns on the proper interpretation of section 11583. ▇ We agree with defendants' explanation of the equitable policy underlying section 11583's enactment. They correctly say this provision reflects a legislative intent to give insurers an incentive to pay injured persons before any settlement or judgment so that the claimant will have

sufficient funds to deal with the unanticipated living expenses or medical costs caused by the accident without the insurer facing the risk of making an overpayment with the plaintiff receiving double recovery. (See generally *Malinski* v. *Wegman's Nursery & Landscaping, Inc.* (1980) 102 Cal.App.3d 282, 290 [162 Cal.Rptr. 287].)

Although we enthusiastically endorse defendants' view of section 11583's purpose, we disagree with their interpretation as to how the Legislature intended the statute should be implemented. Defendants argue that because the executed release does not "expressly" mention the advance of $54,200, they are necessarily entitled to an offset. What defendants overlook in this argument is that section 11583 is only a clear and simple statement of a rule of accounting and not a substantive rule prescribing the form of the settlement agreement. Moreover, section 11583 was not intended to function as a special statute of frauds. "Expressly" does not mean that the document embodying the terms of the settlement must contain a specific reference to the advance. Rather, it is the *settlement* which must "expressly take into account" the advance and that settlement may but need not be reduced to writing. The statute means simply that unless the parties bargain otherwise, the insurer is entitled to a credit for any advance payment on the later settlement or judgment.

Such an interpretation is consistent with the purpose underlying the statute, to encourage advance payments to injured claimants. Obviously if the parties' settlement took the advance payments into account, the lack of an offset does not discourage advance payments in future cases. Under defendants' interpretation, even if a claimant orally agreed to reduce his or her demand for cash up front because of the advance payments, a release drafted as the one in this case was would result in double credit for the insurer. The critical issue to be determined is whether the parties "bargained otherwise"; and it is not a question which can generally be resolved based solely on the pleadings and judicially noticed materials.

Even if "expressly" referred to a *written* expression of the parties' intent, the release here contains such an expression, or at least contains language subject to such an interpretation and as to which extrinsic evidence would be admissible. Dewalt claims that the number "$400,000" and the word "cash" should be taken literally consistent with his claim that the settlement contemplated that the $400,000 would be "new money." Dewalt distinguishes this case from one where the parties may have agreed to a $400,000 total settlement without saying whether any of the payments were to be in installments, and if so, whether any earlier advance was to be credited against such installment payment. If such had occurred here and the parties

had truly overlooked the advance in reaching their settlement, section 11583 would apply. Here, however, the settlement agreement expressly states Dewalt was entitled to *$400,000 cash* as the first payment under the structured settlement.

■ It is well established that evidence of events surrounding the creation of a written instrument is admissible "to prove a meaning to which the language of the instrument is reasonably susceptible." (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37, 40 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373]; see also Code Civ. Proc., § 1860 ["For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the judge be placed in the position of those whose language he is to interpret."].) ■ The materials of which the trial court took judicial notice reflect events preceding the execution of the release which are certainly consistent with Dewalt's literal interpretation of the release. Although Ruff's June 23, 1988, letter provided for a credit of $54,200, his letter of July 20 did not. It did, however, propose a reduction in the amount of the initial cash of $450,000 to $400,000. Later, Chubb's agent used the phrase "cash up front" to describe this payment. This letter was followed by a representation to Ruff that the *$400,000 draft* had been ordered. Finally, Ruff delivered the release and request for dismissal on the condition that it could be used only when "you have caused the *$400,000 draft* to be delivered to me for Mr. Dewalt."

A reasonable inference drawn from these documents and the language of the release providing for $400,000 "cash payment upon execution of this release" is that the advance had been factored into the final settlement and the insurer was to pay an additional $400,000 cash. Presumably, had the insurer intended to send Ruff only $345,800, at a minimum it would have used that sum in describing the amount of the draft it had ordered and Ruff would not have delivered the documents on the condition he receive a $400,000 draft.

As noted earlier, however, our responsibility at this stage of the proceedings is only to determine whether Dewalt's complaint states a viable cause of action. Having done so, including our rejection of defendants' argument that section 11583 precludes the introduction of oral evidence on the parties'

intent, we assume that further proceedings in this action will include evidence proffered by defendants suggesting a different meaning to which the documents are reasonably susceptible.[3]

### DISPOSITION

Judgment reversed. The trial court is instructed to overrule the defendants' demurrer to permit further proceedings consistent with this opinion.

Work, J., and Froehlich, J., concurred.

---

[3]Because the interpretation of a written instrument is "essentially a judicial function" (*Parsons* v. *Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839]), we recognize that further proceedings will likely include a motion or motions for summary judgment. It is only when the foundational extrinsic evidence is in conflict that, arguably, a jury question is presented. (See *Medical Operations Management, Inc.* v. *National Health Laboratories, Inc.* (1986) 176 Cal.App.3d 886, 891, 892, fn. 4 [222 Cal.Rptr. 455].)